Filed 4/19/22

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| NORMANDY ROSE et al., | H048681 |
| Plaintiffs and Respondents, | (San Benito County Super. Ct. No. CU1700151) |
| v. | |
| COUNTY OF SAN BENITO, | |
| Defendant and Appellant. | |


For more than two decades, defendant San Benito County (county or San Benito) provided health insurance benefits for its employees under the Public Employees' Medical Hospital Care Act (PEMHCA or the Act), which requires a participating county to pay retiree health insurance benefits at the same contribution rate it pays to active employees. Starting in January 2017, the county ceased providing benefits under PEMHCA and at the same time reduced the health insurance benefit contribution for Medicare-eligible retirees. Plaintiffs, who are retired county employees, filed this action asserting that the county's actions violated an implied promise made by the county that, upon their retirement, plaintiffs would receive "fully paid" lifetime retiree health insurance benefits, with premium contributions equal to those paid for active employees.

The trial court found after a bench trial that the county's adoption and continued renewal of healthcare benefits under PEMHCA's equal contribution framework evinced a legislative intent to confer a vested right to lifetime, nonmodifiable, retiree health

insurance premiums equal to those paid to active employees. The court at the same time rejected plaintiffs' claim of an implied vested right to "fully paid" lifetime health insurance premiums. In making its decision, the trial court admitted and considered evidence beyond the legislative record. The evidence the trial court relied on included testimony of former members of the county's board of supervisors and other former county employees regarding their knowledge and understanding of the county's provision of retiree health insurance benefits.

On appeal, the county contends that the finding of an implied vested right in lifetime retiree health insurance benefits at an equal contribution rate as that of active employees is unsupported by the legislative and factual record and contrary to California Supreme Court and other case authority. The county argues that plaintiffs failed to overcome the presumption articulated in *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171 (*Retired Employees*) against inferring a private contractual or vested right to public employee benefits, absent a clear basis in the contract or convincing extrinsic evidence. The county also challenges the court's consideration of evidence outside the legislative record as reversible error.

For the reasons explained below, we conclude that the trial court erred in relying upon inadmissible evidence to ascertain legislative intent and in failing to apply the presumption against finding an implied vested right in the absence of a clear manifestation of legislative intent to contractually bind the county. Moreover, we decide that plaintiffs' admissible evidence does not support a finding of an implied vested right. Accordingly, we reverse the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

### A.  Factual Overview

#### 1.  County Funding of Health Insurance Benefits Under PEMHCA

As the elected governing body of the county, its board of supervisors (board) is vested with plenary authority to provide for the compensation of county employees.

2

(Cal. Const. art. XI, § 1(b).) In 1993, the board enacted a resolution to provide health insurance benefits to county employees and retirees by contracting with the California Public Employees' Retirement System (CalPERS). The resolution, titled Resolution No. 93-96,[1] invoked PEMHCA (Government Code § 22750 et seq.)[2] to enable the county to contract with CalPERS.

PEMHCA governs the CalPERS health benefit system. (*Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 606 (*Vallejo Police*).) It authorizes state agencies and local governments to contract with CalPERS to provide health care benefits for eligible public employees and annuitants (i.e., retirees). (§§ 20022, 22768, 22850, subd. (f)(2), & 22922; see Legis. Counsel's Dig., Sen. Bill No. 626 (2003–2004 Reg. Sess.) Stats. 2004, ch. 69.) As set forth in Resolution 93-96, the Act "provides the benefits of [PEMHCA] to employees of local agencies contracting with [CalPERS] on proper application by a local agency." (Citing § 22850.)

PEMHCA also establishes a minimum level of employer contribution toward health insurance premiums and generally requires the employer to contribute the same amount to employees and retirees. (*Vallejo Police*, *supra*, 15 Cal.App.5th at p. 606; see § 22892, subds. (b), (c).) As expressed in Resolution 93-96, the Act allows the contracting agency to "fix the amount of the employer's contribution for employees and . . . annuitants at different amounts provided that the monthly contribution for annuitants shall be annually increased by an amount not less than 5 percent of the monthly contribution for employees, until such time as the amounts are equal." (Citing former § 22857, repealed by Stats. 2004, ch. 69 (S.B. 626), § 22, eff. June 24, 2004; see § 22892, discussed *post*.) Noting the board's desire for county employees and retirees to obtain

---

[1] The descriptive title of Resolution No. 93-96 is "Resolution electing to be subject to Public Employees' Medical and Hospital Care Act fixing the employer's contribution for employees and the employer's contribution for annuitants at different amounts" (some capitalization omitted) (hereafter, Resolution 93-96).

[2] Unspecified statutory references are to the Government Code.

3

"the benefit of the Act and to accept the liabilities and obligations of an employer under the Act," the board resolved in Resolution 93-96 for San Benito to become subject to the provisions of PEMHCA and committed to contributing a specified amount toward the cost of enrolling employees, including family members, in a health benefits plan. That year, by way of example, Resolution 93-96 fixed the county's contribution for unrepresented employees on an individual plan at $137.81 per month; for retirees, the board fixed the county's contribution at "up to a maximum of $1.00 per month" and further provided that its "contribution for each annuitant shall be increased annually by 5.0 percent of the monthly contribution for employees, until such time as the contributions are equal." (Underlining omitted.)

The provision for the county to annually increase the health benefit contribution for retirees until it equalized the contribution made to employees and retirees reflected what is commonly referred to as PEMHCA's "equal contribution" requirement. (See § 22892, subd. (b)(1).) That section required (and still requires) the employer to pay retiree health insurance benefits at the same contribution rate as active employees, though the employer may elect to gradually reach parity under what is often known as PEMHCA's "catchup" provision. (See *id.*, subd. (c).)[3] Thus, in 1993 the county contributed one dollar per month to retirees' medical health benefits. That amount increased annually on a graduated basis, ultimately achieving "catchup" in 2012, when the county's health benefit contribution for retirees equaled that of active employees.

---

[3] We examine the provisions of Resolution 93-96 and their respective statutory reference points in PEMHCA in more detail, *post*. We note that PEMHCA's "equal contribution" and "catchup" provisions, set forth in section 22892, were initially codified at sections 22825 and 22857, respectively, but were renumbered in 2004. The catchup provision was further amended in 2006. (See *Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1563–1564, 1572.)

Consistent with the terms of PEMHCA and the county's personnel rules,[4] the county annually adopted resolutions fixing the contribution amounts for health insurance available to employees and retirees. The county effectuated this for employees represented by a union or other collective bargaining unit by reaching an agreement, memorialized as a memorandum of understanding (MOU), which it then presented to the board through the agenda process as a resolution to be adopted in open session by majority vote.

Each year, the county's human resources division prepared a rate sheet reflecting the contributions agreed on in the MOU and any changes in the CalPERS premiums, to show the county's and employee's respective contributions under various plans. Annual "open enrollment" periods allowed employees and retirees the option of selecting or changing their elected health insurance plan. Unrepresented employees typically received the same contribution toward their health insurance premiums as did employees in the "general bargaining" collective bargaining unit. The MOUs were of fixed duration and subject to renegotiation as of the expiration date.

In November 2012, the board adopted Resolution No. 2012-67, which recognized that parity or "catchup" under section 22892, subdivision (c) had occurred and set equal contributions for employees and retirees beginning in 2013. Prior to 2013, the county's health insurance contributions for active employees, as agreed upon and set forth in the collectively bargained MOUs, covered the full premium cost of certain CalPERS' plans for "employee only" (individual) coverage. For example, from 1999 through 2014, county contributions equaled the full premium for employee only coverage under a plan

---

[4] At all times relevant here, the county has maintained a set of personnel rules which required the county's contribution towards employee health insurance premiums to be determined by collective bargaining between the county and labor unions. Rule 21 (titled "Insurance & Retirement Benefits") (some capitalization omitted) provided as of 1991 that "[t]he amounts contributed by the County toward health insurance premiums shall be as set forth in the current Memorandum of Understanding or management compensation plan as appropriate."

called "PERS Choice."  Starting in 2013, county contributions thus paid the full premium for retirees who selected the "PERS Choice" plan and "employee only" coverage.  Those employees and retirees who selected that plan consequently paid nothing for health insurance that year.

2. Modifications to the County's Premium Contributions and Exit From PEMHCA

Starting in 2007, the board faced challenges brought about by the economic recession, increasing healthcare costs, and the need to address the county's unfunded liabilities.  The board implemented changes to address these concerns, including by contributing to a retirement benefit trust starting in 2008 and adopting a "vesting" schedule in 2009 for employees hired on or after January 1, 2010.[5]

Furthermore, beginning in 2013, the county negotiated MOUs with the various labor units and ultimately established a flat dollar contribution for represented employees' health insurance premiums and capped the county's contributions for retirees eligible for Medicare.  The flat contribution did not cover the full cost to employees of the PERS Choice plan.  The board adopted these changes in 2014 with the passage of Resolution No. 2014-106 and other resolutions,[6] which together had the effect of setting

_____

[5] In the employee benefit context, the term "vesting" has mutliple meanings.  As the California Supreme Court has explained in the context of pension rights, a public employee may become eligible to receive a stated benefit "only after some minimum period of public employment, typically five years" (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 972, fn. 3 (*Cal Fire*)), after which point the employee "is said to be 'vested' with respect to the receipt of" that benefit (*ibid.*).  Critically, "[t]hat is not the same as having a 'vested right.'  That term has come to refer to a benefit of public employment whose repeal or other divestment is constrained by the constitutional contract clause." (*Ibid.*)  Thus, here the board's adoption of a "vesting schedule" refers to the point at which an employee becomes qualified to receive a benefit; it does not, without more, indicate a legislative intent to confer a nonmodifiable "vested right" to that benefit, such as that which plaintiffs seek to establish in this action.

[6] Resolution Nos. 2014-22, 2014-53, 2014-97, and 2014-106 were passed between March 2014 and December 2014.

the county's contributions on behalf of active employees and retirees in amounts less than the lowest cost plan offered by CalPERS. As a result, beginning January 1, 2015, employees and non-Medicare retirees had to pay something for health insurance and no longer had the option of selecting a no-cost individual plan.

Even so, the county's revenues were not keeping pace with CalPERS' rate increases. In December 2016, the board voted to opt out of PEMHCA pursuant to section 22938.[7] To effectuate this change, the board adopted Resolution No. 2016-67, ceasing to be subject to the Act and terminating its contracted coverage as of December 31, 2016. The county instead began providing benefits as of January 1, 2017, under contract with the California State Association of Counties Excess Insurance Authority (CSAC-EIA).

The county's contributions in 2017 did not cover 100 percent of any of the health benefit options provided by CSAC-EIA (i.e., all employees and non-Medicare retirees continued to have to pay something for health insurance) but continued to tie contributions for non-Medicare retirees to those for active employees. For Medicare-eligible retirees, the county capped its contribution toward health insurance premiums at 70 percent of the contribution rate for active employees. The county provided coverage at similar rates in 2018, 2019, and 2020.

### 3. Plaintiffs' Medical Benefits in Employment and Retirement

Plaintiffs Normandy Rose (Rose) and Margaret Riopel (Riopel) (together, plaintiffs) are retired employees of the county. From the start of their tenure with the county, until the county's exit from PEMHCA in January 2017, Riopel and Rose each

---

[7] Section 22938 authorizes "[a] contracting agency that has elected to be subject to [the PEMHCA] . . . to cease to be so subject by resolution adopted by a majority vote of its governing body and filed with the board on or before the deadline provided in board regulations, to be effective at the end of the current contract year. Coverage of employees and annuitants of the contracting agency shall also terminate at the end of the current contract year." (§ 22938.)

7

participated in a plan for health insurance benefits sponsored by the county under PEMHCA.  Plaintiffs thereafter selected plans through CSAC-EIA.

a.  Rose

Rose began working for the county in 1999 as the director of integrated waste management.  Rose served in this position, which was "unrepresented" (i.e., not part of any bargaining unit or union), until her retirement in January 2015.  During her tenure with the county, Rose elected employee-only coverage under the PERS Choice plan, which the county's contribution covered at 100 percent.  Rose maintained her individual PERS Choice coverage through her retirement in January 2015 and until the county opted out of PEMHCA.

The first time Rose had to contribute to her medical insurance was in 2015, after the board passed Resolution No. 2014-106, which fixed the county's PEMHCA contributions for unrepresented employees at less than the full cost of the employee-only coverage under the PERS Choice plan.  Rose was unaware of the changes and testified that the county did not inform unrepresented department heads, such as herself, of the change before she retired in January 2015.  Therefore, in 2015, after the county's contribution, Rose paid approximately $106 per month toward her selected PERS Choice plan.

When the county began providing health benefits through CSAC-EIA in 2017, Rose selected individual coverage under an EIA Anthem plan, which required her to contribute an increased balance (approximately $184 per month in 2017) to her monthly premiums.  After Rose became Medicare eligible in 2019, her monthly premium dropped to $54, then increased from $54 to $99 in 2020.  Rose testified that the county administrative officer at the time she was hired in 1999 told her that the county paid "100 percent of the individual health plan," including in retirement and it was part of the compensation package because the county knew it could not offer high wages

8

comparable to the surrounding counties. She believed the county had a continuing obligation to cover the full amount of her individual medical premium.

### b. Riopel

Riopel was hired as a typist clerk in 1986. After several promotions, including to two different, unrepresented department head positions, Riopel retired from the unrepresented position of management analyst III (in the administration department) in December 2012.

During her tenure with the county, Riopel typically elected two-party coverage under various CalPERS health plans. Because her elected coverage was not employee-only but included a dependent, Riopel had to pay some amount toward her monthly premiums, which the county's contribution did not fully cover. At the time of her retirement in 2012, Riopel had elected two-party coverage under the PERS Choice plan and was contributing approximately $212 toward her monthly health insurance premium. Later, when Riopel became eligible for Medicare in March 2014 and until the county opted out of PEMHCA in December 2016, the county's contribution under PEMHCA covered Riopel's two-party plan premium in full.

In 2017, Riopel elected two-party coverage under an EIA Anthem health plan available through CSAC-EIA. Based on the cost of her elected plan's premium and the county's contribution, Riopel again began to pay an amount ($34 per month) for health insurance for her and her husband. Riopel believes the promise the county made to her was for 100 percent coverage of her medical premium in retirement and at the same rate as active employees.

### B. Procedural History

#### 1. Operative Complaint and Summary Judgment

In 2017, after the above-described changes to the county's retiree health insurance benefits resulted in increased premium payments for Rose and Riopel, plaintiffs filed their original complaint and petition in the superior court. There followed a first

amended complaint and petition in December 2017 and the operative, second amended complaint and petition (operative complaint) in March 2018.

The operative complaint alleged that the county had "intended and promised" to provide Rose and Riopel "with fully paid retiree health care benefit premiums" as expressed in the board's 1993 decision to contract with CalPERS under PEMHCA, and in statements made by the board at board meetings and by county management personnel to plaintiffs. It averred that the county breached its promise through resolutions in 2014 and 2016 which reduced the amount paid on behalf of active employees and retirees to less than 100 percent of the healthcare premium costs and, as of January 2017, terminated the provision of retiree healthcare benefits through PEMHCA. According to the operative complaint, the benefits provided through CSAC-EIA failed to cover 100 percent of the healthcare premium costs and implemented a two-tier system for active employees and retirees that reduced the county's contribution toward premiums for those 65 years of age and older (i.e., Medicare eligible).

Plaintiffs sought to enforce their "rights to 100% paid retiree medical premiums and benefits, no less than those received at their time of retirement from the County of San Benito" by asserting causes of action for (1) declaratory relief, (2) impairment of contract in violation of article I, section 9 of the California Constitution, and (3) writ of mandate, prohibition or other appropriate relief. Plaintiffs sought a judicial declaration that Resolution No. 2016-67 was unconstitutional, invalid, and unenforceable. They alleged that Resolution No. 2016-67 impaired the vested, contractual right to fully paid retiree health benefits in the amount provided to active employees, which the county had promised to plaintiffs as inducement for accepting the county's less competitive wages. Among other writ relief in the third cause of action, petition for writ of mandate or prohibition, plaintiffs sought to enjoin any application of Resolution No. 2016-67 to them and instead to require continued payment of monthly contributions toward their retiree healthcare benefits as they had enjoyed at the time of their retirement.

10

The county answered the operative complaint and later moved for summary judgment. The county asserted that plaintiffs could not as a matter of law overcome the presumption against creation of a vested contractual right to lifetime retiree healthcare benefits as articulated by the California Supreme Court in *Retired Employees*. In support of its motion, the county primarily relied on the resolutions and MOUs adopted by the board between 1993 and 2016 related to its provision of healthcare benefits through PEMHCA and, later, CSAC-EIA.

Plaintiffs responded that there was a triable issue of material fact—based on the resolutions providing fully paid retiree healthcare benefits, the declarations of former county supervisors, and plaintiffs' own recollections—regarding the legislative intent to confer a vested, contractual right to fully paid retiree healthcare benefits for life. The county objected to plaintiffs' evidentiary submissions, including to the declarations of three former members of the board of supervisors. The county argued the supervisors' declarations established no more than the subjective beliefs of the declarants and could not serve as competent evidence of the board's collective intent, which the county argued was "the only intent that matters" under *Retired Employees*.

The trial court denied the motion for summary judgment. The court found that in relying on the presumption outlined in *Retired Employees*, the county failed to address whether the county's resolutions, provision of benefits, or any promises to employees could have conferred a vested contractual right to lifetime retiree benefits. The court declined to rule on the county's evidentiary objections as immaterial to the disposition of the motion. It rejected the other grounds cited in support of summary judgment.

## 2. Trial

The bench trial on plaintiffs' claims took place over three days in February 2020. A central issue at trial was the admissibility of extrinsic evidence concerning the board's legislative intent behind the resolutions providing retiree healthcare insurance benefits. After considering the county's motion in limine to exclude evidence outside the

11

legislative record, the trial court heard testimony from former county supervisors and employees and admitted joint trial exhibits of the legislative record, starting in 1993, related to the resolutions fixing healthcare benefits for employees and retirees.

a.   Motion in Limine to Exclude Extrinsic Evidence of Legislative Intent

In a motion in limine and throughout trial, the county sought to restrict evidence of legislative intent to "the resolutions themselves and the legislative record accompanying their adoption."  The county argued that " 'extra-record' " evidence such as "the post hoc testimony" (italics omitted) of former supervisors regarding their subjective intent, understanding, and beliefs in voting on resolutions, as well as evidence related to the subjective beliefs and understandings of plaintiffs and individual county personnel "communicated outside the legislative process" in which the benefits were conferred, was irrelevant and inadmissible to prove plaintiffs' vested rights claim.

Plaintiffs opposed the motion in limine as an improper attempt to exclude relevant evidence and contrary to the California Supreme Court's direction in *Retired Employees*. Plaintiffs asserted under *Retired Employees*, courts may examine the facts and circumstances surrounding legislative acts for a manifestation of intent to create vested rights when the legislative record contains no explicit acknowledgement of contractual intent.  Plaintiffs argued that the legislative record in this case, which showed the resolutions were passed via consent calendar without comment, provided no guidance regarding the board's intent to create a vested right in fully paid retiree healthcare insurance benefits and therefore warranted testimony by former supervisors and county employees about the circumstances surrounding the county's enactments.  Plaintiffs maintained they would not seek to introduce evidence regarding these individuals' subjective intent but rather would establish "the circumstances and information presented to the Board at the time of the enactment of various Resolutions."

After considering the arguments of the parties, the trial court declined to grant the county's motion in its entirety.  The court clarified that it would grant the motion "as it

12

applies to the subjective intent of the decision makers" (which both sides agreed was inadmissible) but would partially deny the motion and allow testimony related to the circumstances surrounding passage of the resolutions, subject to further consideration during trial.

Throughout trial, the county's counsel objected to questions posed to former supervisors about what they "knew" or "understood" about resolutions concerning retirement benefits; the trial court allowed the testimony but indicated it should address "what information was provided" to the supervisors as opposed to what they knew or understood. The county emphasized that such testimony was admissible only to the extent that information brought to the attention of the legislators went to the collective body, or the board as a whole, and that communications outside of the conferral process were inadmissible. Plaintiffs responded that the evidence necessary to clarify the nature of the implied vested right included "knowledge available to the individuals who made the decision and what was communicated to them" and the knowledge of those who typically advised and communicated with the board.

The trial court later clarified that while case authority prevented individual legislators from testifying as to what they privately believed a measure would do, there was nothing in the law that precluded "evidence of what legislators said about a proposal before them in the presence of the body, even if their statements can be received as reflecting a mental state." The court reiterated that it was allowing the supervisors' testimony not as to their "knowledge" but "[a]s to what they were informed of." The county responded that in light of the fact that former supervisor testimony was being admitted over its objection, it would introduce several supervisors as witnesses.

b. Testimony of Former Supervisors and County Employees

Several former supervisors and county employees testified for plaintiffs about the county's commitment to confer lifetime, vested healthcare benefits to employees and retirees. The former supervisors included Michael Graves, who served on the board from

1982 to 1995, Richard Place, who served from 1997 to 2000, Patricia Loe, who served from 2003 to 2010, Reb Monaco, who served from January 2003 until December 2010, and Donald Marcus, who served from 2005 through 2008. The former supervisors' testimony generally addressed such subjects as the board's purpose in providing retirement healthcare benefits, its understanding of the resolutions enacted, each supervisors' process for reviewing resolutions and agenda item transmittals, and to whom the supervisor would direct inquiries about retirement or healthcare benefits.

For example, Graves, who was a supervisor in 1993 when the board elected to become subject to PEMHCA, testified that when the board "approved a contract that contained retirement health benefits" it intended "to create a mechanism to retain trained employees in the County for an extended period of time." Graves described the retirement health insurance benefit as "an inherent lifetime benefit to retain employees in San Benito County." Graves believed that somewhere in the legislation or memoranda of understanding there must have been language obligating the county to pay 100 percent of retirees' employee-only coverage for life but was unable to identify a document or enactment containing such language. Graves indicated that he would be "very surprised" if language committing the county to paying 100 percent of the healthcare premium upon retirement did not exist in any resolution or MOU and suggested "the fact that it took place for as long as it did until it was changed, is evidence -- self evident." When cross-examined about his understanding of the feature that enabled the county, when it first became subject to PEMHCA, to contribute less toward retiree health benefits than to active employees, Graves testified that he believed "at the time it was the same amount" and provided "fully paid" retiree medical benefits.

Former supervisor Place noted that he obtained information about benefits offered from the county administrative officer at the time, David Edge, who told him that after five years of service to the county, he would receive a vested, lifetime benefit paying 100 percent of employee-only healthcare coverage. Place believed the vested benefit was the

county's "standard practice" which could not be taken away from a retired employee without renegotiating.

Former supervisor Patricia Loe similarly testified that she learned about retirement benefits from David Edge as well as human resources technician Jacqueline Credico. Loe understood that lifetime health insurance benefits covering the individual employee were "guaranteed" after five years of service to the county. Loe was certain the board discussed the commitment to provide fully paid retiree healthcare "several times" in connection with resolutions fixing the county's contribution toward the employee health insurance benefits but could not recall particular public sessions where it was discussed. Loe believed that at all times during her tenure, the county provided retirees with fully paid benefits; she was not familiar with the difference between contribution rates for retirees and employees under PEMHCA's catchup provision.

Former supervisor Monaco also testified that he would approach Credico in human resources for information about retiree health insurance benefits. Credico informed him, as to his personal benefits which he began to receive while employed as a board member, that his retiree health insurance benefits would be provided for life. He recalled that retirees' benefits were "fully paid" (except for what Medicare covered) and extended to whichever plan the retiree chose. Monaco, like Loe and Graves, did not recall resolutions setting different contribution amounts for employees and retirees. Monaco believed, based on information from Credico, conversations with other supervisors, and on his own receipt of benefits, that a resolution prior to his tenure committed the county to provide fully paid retiree health insurance benefits for life.

Former supervisor Donald Marcus testified that in voting on resolutions related to retiree health insurance benefits in 2005 and 2007, he understood that "vested" employees who retired with the county would continue to receive health insurance benefits. Marcus had no understanding at the time about whether, when an individual retired, the benefit was theirs "in perpetuity after their retirement." Like other

15

supervisors, Marcus obtained information about the resolutions regarding health insurance from Credico.

Plaintiffs also presented several former county employees and managers as witnesses, including David Edge and Jacqueline Credico. Edge served as the county administrative officer from 1989 to 1998, where he oversaw the board's administrative duties, including budgeting, board meeting agenda, labor relations, and human resources. Edge understood in his administrative officer role that the county's provision of healthcare benefits entitled retirees to the same benefit the employees received and that the county could modify its policy going forward but not retroactively. He conveyed his understanding to the board that once an employee retired, the benefit was vested or could not be modified. The retirement benefits allowed San Benito to stay competitive with the higher wages offered by other counties. Edge acknowledged on cross-examination that he did not recall specific resolutions or records that would reflect his understanding that retirees' benefit contributions were equal to those of active employees.

Jacqueline Credico worked for the county from 2002 to 2018, including in the role of human resources manager and risk manager from 2006 to 2014, since there was no human resources director at the time. During her tenure in human resources, she enrolled eligible employees for benefits, participated in recruitment and applicant screening, and attended conferences and information sessions on behalf of the county. Credico confirmed that for individual employee plans during her tenure, the county contributed to healthcare benefits at "[t]he highest level" which covered 100 percent of the premium for the "CalPERS Choice" plan. The printed materials provided to new hires stated that employees who retired under CalPERS would be eligible to retain their CalPERS sponsored health benefit, "as long as the County was a participant."

Credico understood, from trainings she attended, the growing concern among public agencies related to unfunded liabilities around "Other Post-Employment Benefits" (OPEB). She learned that it was "not so easy" for the county to exit CalPERS and

16

understood that participants had a "contractual obligation" to provide retirees with a comparable health plan and contribution. She communicated to prospective retirees that the county's "equal contribution" commitment—once attained—would be their benefit for life. Credico communicated the same information to the board, explaining that once the county reached "catch-up" in 2012, retirees would receive the same contribution that active employees received. In a colloquy documented in board meeting minutes discussing the 2012 resolutions fixing the county's health insurance premium contributions, Credico responded to questions posed by Supervisor Anthony Botelho about the "equal contribution" provision and indicated the "commitment had been made in 1993 in regards to health benefits for retirees" and that the county would have the opportunity to renegotiate its contributions "when contracts opened up with the bargaining units."

Plaintiffs also called former county employees Denise Thome and Elsie Marshall. Thome, who worked for the county from 1978 to 1995, then returned in 2010 to serve as county clerk of the board, testified that when she was considering returning to work for the county in 2010, she ran into former supervisor Patricia Loe, who reminded her that although the county was not able to pay competitive wages, "they always offered the benefit of paying the medical insurance for the retiree." When Thome later inquired about the status of her retirement benefits, the interim director of human resources at the time, Georgia Cochran, provided her a letter stating that employees with a hire date on or before December 31, 2009, "receive the same contribution as active employees [] currently receive."

Elsie Marshall was a human resources technician for the county from 2005 to 2013 and reported to Jacqueline Credico. In that role, she explained healthcare benefits to employees and retirees, including regarding their eligibility for lifetime health insurance benefits. Marshall described the retiree health benefits as an "extremely rare and popular benefit." Marshall testified that the county was committed to pay the

17

premium cost for retiree-only coverage for the plan with the greatest enrollment, typically "PERS Choice." She confirmed on cross-examination that she was not aware of any board meeting, staff reports, or agenda items that referenced a commitment to provide fully paid retiree benefits at a certain level.

Several of plaintiffs' witnesses, including Reb Monaco, Jacqueline Credico, and Elsie Marshall, acknowledged that because they received retiree healthcare benefits through the county, they had a personal interest in the outcome of the lawsuit.

Witnesses for the county included Georgia Cochran, who was the interim human resources director in San Benito County for four years starting in April 2013, deputy county administrative officer Edgar Nolasco, and former supervisors Margie Barrios and Anthony Botelho.

Cochran testified about the county's decision to lower health insurance contributions under PEMHCA in 2014, when the county partnered with labor unions and negotiated the shift to a "flat rate contribution towards medical" of $550 for the individual plan. Cochran was present for the legislation's enactment and was not aware of any information suggesting the county was obligated to confer "fully paid" healthcare benefits for retirees. Cochran also was involved in the board's decision in August 2016 to withdraw from PEMHCA, in response to rapidly escalating increases in health insurance rates under CalPERS. After issuing a request for proposals, the county convened the insurance committee with representation from labor unions but did not reach consensus. On August 9, 2016, the board elected to exit PEMHCA, and CSAC-EIA became available as of January 1, 2017. Cochran never received information suggesting that employees who retired under the equal contribution requirement had a lifetime entitlement to receive equal contribution.

Former supervisor Margie Barrios served on the board from 2009 to 2016. Barrios did not recall any information in the resolutions or accompanying staff reports and agenda item transmittals, or in the board's discussions, indicating that the board had

18

committed to pay the full cost or a set amount toward retirees' healthcare benefits for life. Barrios recalled language in the resolutions related to the equal contribution requirement but denied receiving information that once an individual retired, they had a vested right to the same health insurance contribution as active employees for their lifetime. Barrios also testified that an individual employee of the county, including human resources management, did not have the authority to bind the county with regard to matters of employee compensation, which required a majority vote of the board.

Anthony Botelho, who served on the board starting in 2005, described the board's annual process in fixing the county's contributions toward employee and retiree health insurance benefits under PEMHCA. Botelho testified that in 2012, he had requested that Resolution No. 2012-67 be "pulled for discussion" and taken off the consent agenda. There ensued a public discussion of the catch-up provision under PEMHCA, which Botelho understood required that the county complete the step-up to equalize retirees' contributions even as employees were being laid off. Credico, in response, referenced the county's obligation under PEMHCA to provide comparable health benefits for retirees as for active employees. Botelho did not recall any information in resolutions, staff reports and agenda item transmittals, or board discussions, indicating that the board's resolutions committed the county to pay the full cost or a set amount toward retirees' healthcare benefits for life.

c. Parties' Contentions

In closing arguments, plaintiffs identified two theories of implied contract. First, they argued the benefit "was a 100 percent paid individual plan," specifically a "contribution rate equal to 100 percent of the medium range plan for an individual employee," and the county violated its contractual promise "when [it] failed to provide a contribution rate equal to an individual plan." Second, they argued the benefit required any cap on the contribution rate for active employees to "be equal for the retirees who

19

retired before the County exited PEMHCA," and the county violated its promise "when [it] failed to provide a contribution rate equal to what is given to active employees."

Plaintiffs emphasized that, as stipulated by the county, the resolutions from 1993 to 2012 did not contain language stating that the county could opt out of its obligation to provide retiree health insurance benefits as required by PEMHCA. Furthermore, plaintiffs argued that the board looked to county personnel like David Edge and Jacqueline Credico for information about the retiree healthcare benefits, and Edge and Credico uniformly agreed that the healthcare benefit vested upon retirement and could not be retroactively diminished.

In response, the county emphasized that in the absence of an express contractual obligation—which both sides agreed did not exist in this case—proof of an implied contract under *Retired Employees* required a clear and unmistakable intent by the board to grant a vested right in the "fully paid" retirement benefit. The county argued that plaintiffs' own ambiguity about the nature of the promise and the need to rely on extrinsic, largely inadmissible evidence demonstrated that plaintiffs could not overcome the legal presumption against a finding of implied contract.

d. Tentative Ruling and Statement of Decision

Following the receipt of posttrial briefing, the trial court issued a tentative ruling. The tentative ruling, later designated as the court's proposed statement of decision and made final in the judgment, found substantial evidence to support plaintiffs' implied contract claim.

In its ruling, the trial court concluded that "the circumstances shown by the evidence clearly establish[] that the County did enter into an implied contract with its employees promising, in exchange for working during their active years at lower wages, upon retirement they would be compensated by having their health benefits paid at the same rate as active employees." The trial court found "[t]his was clearly intended as an integral component of the employment agreement."

20

It further reasoned, based on the information provided to prospective and active employees by the county's authorized personnel, that if the board did not intend to create such an implied right, "it would be expected that definitive action would have been taken early on to correct the situation.  But, having full knowledge as to what the retiree benefits were known to be, [the board] took no action to modify them prior to 2014." The trial court thus concluded that while the recent changes to retiree healthcare benefits may operate prospectively, they "cannot negate the vested retirement rights guaranteed to Plaintiffs."

The trial court rejected plaintiffs' claim, however, of an implied contract under which the county would pay 100 percent of their health insurance premiums.  The court found that the claim to 100 percent paid coverage "was based upon a misunderstanding" stemming from the fact that at the time Resolution 93-96 was adopted, the county covered 100 percent of employee contributions.[8]

The trial court also clarified its evidentiary ruling based on the county's in limine motion to exclude testimony of members of the board as to their individual expressions of intent in adopting Resolution 93-96.  The court noted it had declined to exclude the evidence "entirely, so as not to preclude its potential admissibility and relevance for some non-prohibited purpose."  It found the testimony of both David Edge and Jacqueline Credico especially "relevant and admissible to circumstantially show the Board had knowledge about the retiree benefits and how that information had continuously for years been disseminated to the employees."

The trial court observed, "Expressions of intent stated by Board members during these discussions further affirmed the County management's reasonable reliance, and the

---

[8] Although not at issue on appeal, we note the trial court's finding that "at the time Resolution 93-96 was adopted the County was covering 100% of employee contributions" is accurate only with respect to individual coverage for select plans (i.e., PERS Choice) from 1993 to 2013.

testimony of those members at trial confirmed that those dis[cus]sions took place as reported. The Board, thereafter taking no action to attempt modification of these benefits, provides strong evidence that these were the health benefits as promised to the employees by the adoption of Resolution 93-96."

The court concluded from this evidence "that in order to be able to attract and retain qualified employees while offering lower salaries than otherwise available, the county entered into an implied in fact contract that promised eligible retirees paid health insurance premiums equal to those paid for active County employees. The County's withdrawal from PEMHCA years later did not release it from this implied promise. The actual amount the County is obligated to pay is subject to change in accordance with those agreements resulting from terms of the periodic MOUs entered into between the County and active employees."

The court concluded with respect to the implied contract, "[t]he terms of the contract are non-modifiable. To be otherwise would render the County's promise ephemeral and meaningless since the promised coverage could be unilaterally changed at any time."

### 3. Judgment

The trial court entered judgment in favor of plaintiffs on September 9, 2020. The court amended the judgment on December 3, 2020, to reflect the amount owed to each plaintiff in damages and interest, calculated as "the previously paid difference between active and retiree health insurance premiums, from [each plaintiff's] retirement to date." The amended judgment also provided that plaintiffs could apply for "statutorily allowable attorney fees." The county timely filed its notice of appeal from the judgment and amended judgment on December 15, 2020. On March 3, 2021, after further proceedings, the trial court awarded plaintiffs attorney fees pursuant to Code of Civil Procedure section 1021.5.

22

## II.  DISCUSSION

The principal issue on appeal is whether the trial court erred in its conclusion that plaintiffs' evidence satisfied the legal standard set out in *Retired Employees* to prove that the county intended to provide retired county employees with a vested right to lifetime healthcare benefits equal to that provided for active employees and entered into an implied contract to do so.[9]

### A.  *Standard of Review*

Where, as here, the appeal presents questions of both law and fact, our Supreme Court has explained the principles governing the standards of appellate review.

" 'Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test.  Questions of law relate to the selection of a rule; their resolution is reviewed independently.  Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied.  . . .  If, . . . the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently.' " (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 (*Haworth*).)

In this matter, the county seeks to demonstrate that the trial court's determination regarding the existence of an implied vested contractual right contravenes the legal presumption articulated in *Retired Employees* " '*against* the creation of a vested contractual right.' " (*Cal Fire*, *supra*, 6 Cal.5th at p. 983.)  Our examination thus requires " ' "the consideration of legal concepts and involve[s] the exercise of judgment about the values underlying legal principles" ' " (*Haworth*, *supra*, 50 Cal.4th at p. 385), thus triggering independent review.  (See *Cal Fire* at p. 976 [applying independent review to

_____

[9] The county also raises arguments on appeal as to equitable estoppel and the defenses of statute of limitations and laches.  The county has elected not to separately appeal the fee award, which it submits "will rise or fall with the judgment."

23

whether a claimed public employee benefit was a vested right protected by the constitutional contract clause].)

Further, the contested issue surrounding the admission of extrinsic evidence outside the legislative process to prove the board's intent requires this court to evaluate the trial court's evidentiary rulings. In particular, we examine the trial court's determination that the evidence was sufficient to prove the county's intent to establish an implied contractual right to the specified, vested retirement benefits. Several additional precepts guide our review of this question.

"As a general matter, evidence may be admitted if relevant (Evid. Code, § 350), and ' "[r]elevant evidence" means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action' (*id.*, § 210)." (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1213 (*Coffey*).) However, even as a trial court has broad discretion in determining the relevance of evidence (*ibid.*), it lacks discretion to admit irrelevant evidence (*People v. Riggs* (2008) 44 Cal.4th 248, 289). We generally review a trial court's rulings concerning the admissibility of evidence for abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) To the extent the relevancy determination in this case turns primarily on the application of the legal standard enunciated in *Retired Employees*, the issue is a question of law, which we review de novo. (See *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476.)

     *B. Implied Contractual Right to Vested Retiree Healthcare Benefits Equal to Those Provided to Active Employees*

          1. <u>Analytical Framework</u>

Plaintiffs' claim is founded on the concept of vested rights. The vested rights doctrine "is grounded in the constitutional contract clause" in the United States and

24

California Constitutions.[10]  (*Cal Fire*, *supra*, 6 Cal.5th at pp. 976–977.)  The contract clause "prohibit[s] the enactment of laws effecting a 'substantial impairment' of contracts, including contracts of employment."  (*Id*. at p. 977.)  Understood in this context, the term " 'vested right' " refers to a "benefit of public employment whose repeal or other divestment is constrained by the constitutional contract clause."  (*Id*. at p. 972, fn. 3.)

The terms and conditions of public employment are generally established by statute rather than by contract.  (*Cal Fire*, *supra*, 6 Cal.5th at p. 977.)  Consequently, most terms of public employment are *not* protected by the contract clause and may therefore be changed by the relevant legislative body.  As emphasized by the California Supreme Court, "[c]ontract clause protection of the terms and conditions of public employment historically has been the exception, rather than the rule."  (*Ibid.*)

In *Retired Employees*, in response to a question certified by the United States Court of Appeals for the Ninth Circuit, the California Supreme Court considered whether a California county can form an implied contract with county employees that would, by virtue of the operation of the contract clause, confer a vested contractual right to lifetime retiree health benefits.  (*Retired Employees*, *supra*, 52 Cal.4th at p. 1176.)

The California Supreme Court recognized that the principles governing intent to form implied contractual terms in the context of public employment benefits are the same as those that govern interpretation of private contracts.  (*Retired Employees*, *supra*, 52 Cal.4th at p. 1179; see Civ. Code, § 1635.)  These rules provide that a contract may be either express or implied.  (*Retired Employees*, at p. 1178, citing Civ. Code, § 1619.)  While express contract terms are stated in words (Civ. Code, § 1620), "[t]he existence

---

[10] Article I, section 10, clause 1 of the United States Constitution states that "No state shall . . . pass any . . . law impairing the obligation of contracts . . . ."  (U.S. Const., art. I, § 10, cl. 1.)  The California Constitution similarly provides, "A . . . law impairing the obligation of contracts may not be passed."  (Cal. Const., article I, § 9.)

and terms of an implied contract are manifested by conduct." (*Retired Employees*, at p. 1178; see Civ. Code, § 1621.) Conduct to form an implied contract, or implied contractual terms, must reflect " 'a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' " (*Retired Employees*, at p. 1178.)

In the employment benefit context, where the benefit in question has been conferred by board resolution, the court looks to the resolution to ascertain the parties' contractual rights and obligations. (*Retired Employees*, *supra*, 52 Cal.4th at p. 1185.) There are, according to *Retired Employees*, "limited circumstances" under California law in which contractual rights may be implied from such legislative enactments. (*Ibid.*) These limits stem from the fact that "[a] resolution by a county board does not only—or even primarily—establish contract rights" but rather is a means "by which a board of supervisors exercises its authority to effect policy." (*Ibid.*) " 'Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.' " (*Ibid.*) Accordingly, the court held that there is a legal presumption *against* creation of a vested contractual right from a resolution or statutory scheme. (*Id.* at pp. 1185–1186.) " '[I]t is presumed that a statutory scheme is *not* intended to create private contractual or vested rights and a person who asserts the creation of a contract with the state has the burden of overcoming that presumption.' " (*Id.* at p. 1186, italics added.)

The court in *Retired Employees* instructed that to overcome the presumption against a finding of implied contractual rights, "the statutory language or circumstances accompanying its passage" must " 'clearly " . . . evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187.) The intent to make a contract need not be express but it must be "clear." (*Ibid.*)

26

Recognizing that an implied a contractual right to a lifetime retirement benefit "raise[s] legitimate" economic concerns for public agencies (*Retired Employees*, *supra*, 52 Cal.4th at p. 1188), the California Supreme Court directed courts to " 'proceed cautiously both in identifying a contract within the language of a . . . statute and in defining the contours of any contractual obligation.' " (*Ibid.*) The court reiterated, "as with any contractual obligation that would bind one party for a period extending far beyond the term of the contract of employment, implied rights to vested benefits should not be inferred without a clear basis in the contract or convincing extrinsic evidence." (*Id.* at p. 1191.)

The California Supreme Court highlighted that requiring a clear showing of legislative intent to create contractual rights in order to overcome the default presumption against them, "should ensure that neither the governing body nor the public will be blindsided by unexpected obligations." (*Retired Employees*, *supra*, 52 Cal.4th at pp. 1188–1189.)

The California Supreme Court in *Cal Fire* reaffirmed the principles articulated in *Retired Employees*, including the presumption against legislative creation of a vested contractual right. In reviewing the conclusion of the court in *Retired Employees*, the high court noted that "the existence of the MOUs" between the county and employees in *Retired Employees* was "critical to its conclusion that an implied contractual right could have been created." (*Cal Fire*, *supra*, 6 Cal.5th at p. 980.)

In *Cal Fire* itself, the court rejected the plaintiffs' claim that a statute enacted in 2003, which gave state employees the opportunity to purchase additional retirement service credit (and boost their eventual pension benefits), created a vested right to purchase such credit. (*Cal Fire*, *supra*, 6 Cal.5th at pp. 969–971.) In examining the issue, the court reiterated that the principal function of a legislature is not to make contracts but to make laws that establish governmental policies, which " ' "are inherently subject to revision and repeal." ' " (*Id.* at p. 978.) After reviewing the terms of the

27

statute, the court concluded it did not " 'clearly evince a legislative intent to create private rights of a contractual nature,' which is required before such rights will be found." (*Id.* at p. 982.)

Nor had plaintiffs shown intent through any "text, legislative history, or other evidence suggesting that the Legislature intended to make [additional retirement service] credit an irrevocable feature of the employment of then-existing public employees." (*Cal Fire*, *supra*, 6 Cal.5th at p. 983.) The court also rejected the plaintiffs' theory that the opportunity to purchase service credit was a form of deferred compensation akin to pension benefits. (*Id.* at pp. 986–987.) Notably, the court compared the service credit to "other optional benefits offered to public employees in connection with their work"— including the opportunity to purchase health insurance benefits through a provider—and noted it had "never suggested that this type of benefit is entitled to protection under the contract clause." (*Id.* at p. 987.)

It is unmistakable from this precedent that California law contains a strong presumption against a finding of implied contractual rights for public employees. To overcome that presumption here, plaintiffs must establish that the board acted with the "requisite clear manifestation of intent" (*Cal Fire*, *supra*, 6 Cal.5th at p. 981) to create an implied, vested, contractual right to nonmodifiable retiree health benefits. Under *Retired Employees*, such intent may be proven by "the statutory language or circumstances accompanying its passage." (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187.)

2. Parties' Contentions

The county asserts that plaintiffs failed to make this showing, and the trial court's conclusion to the contrary was error. First, the county maintains the trial court erred by considering inadmissible extrinsic evidence outside the legislative record to ascertain legislative intent. Second, the county contends the trial court erred by misconstruing the

28

law and failing to apply *Retired Employees*'s presumption against an implied vested contractual right to the evidence at trial.[11]

Plaintiffs respond that because the legislative record did not provide substantive guidance as to the board's intent to create a vested right, the trial court properly admitted testimony of former members of the board and administrative staff from which to ascertain the legislative intent. Plaintiffs argue that the county's legal arguments misread and misapply the *Retired Employees* standard, which plaintiffs assert the evidence at trial readily satisfied. A brief filed by amici curiae League of California Cities and California State Association of Counties in support of the county's appeal emphasizes the importance, from the standpoint of cities and counties throughout California, that courts adhere strictly to the standard set forth in *Retired Employees*.

### 3. Analysis

Both parties agree that there was no express contract between the county and plaintiffs to pay retirees' healthcare benefits at the same rate as active employees in perpetuity. Plaintiffs rely instead on a theory of implied contract. As the California Supreme Court has observed, a contract implied in fact " 'consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words.' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1178.)

We begin by clarifying the implied promise at issue on appeal. As the county points out, plaintiffs identified various expressions of the promise they sought to enforce

---

[11] In its briefing on appeal, the county asserts numerous grounds for reversing the trial court's ruling. It contends, inter alia, that plaintiffs failed to prove a vested contractual right to lifetime retiree healthcare premiums equal to those paid for active employees, that the trial court erred in admitting extrinsic evidence of legislative intent, that plaintiffs failed to identify the purported promise much less prove the board intended to bind the county to it, and that the legislative record does not support an implied contractual vested right. The county further contends, in an argument raised for the first time in its reply brief, that an implied contractual obligation is void and unenforceable here. For ease of exposition, we have distilled the county's principal contentions on appeal into two key challenges identified *ante*.

through this litigation.  The operative complaint alleged that Resolution 93-96, together with subsequent resolutions and communications by the board and county officials, manifested a promise to provide "fully paid" or "100% paid" retiree healthcare benefit premiums, "no less than those received at their time of retirement from the County of San Benito."  Plaintiffs offered testimony at trial to this effect, including the recollections of former supervisors Patricia Loe, Reb Monaco, Richard Place, and Michael Graves, and argued this version of the promise in their posttrial brief.

Plaintiffs at trial also asserted a different implied contractual term—namely that the county promised to provide lifetime retiree healthcare benefits (for those employees who retired before the county exited from PEMHCA) in parity with those provided for active employees.  In support of this articulation of the implied contractual term, plaintiffs offered the testimony of former human resources technician Elsie Marshall, former clerk of the board Denise Thome, and former county administrative officer David Edge.  Lastly, plaintiffs additionally offered testimony to the effect that the promised, vested healthcare benefit entitled them to 100 percent of the "medium range plan" offered.

As noted, *ante*, the trial court found that the alleged promise of "fully paid" or "100% paid" retiree health insurance premiums "was based upon a misunderstanding" related to the coverage provided at the time Resolution 93-96 was adopted.  The court instead ruled that the county "enter[ed] into an implied contract with its employees promising, in exchange for working during their active years at lower wages, upon retirement they would be compensated by having their health benefits paid at the same rate as active employees" and that the promise "was clearly intended as an integral component of the employment agreement."[12]

---

[12] The county contends that plaintiffs' shifting identification of the purported promise underscores their inability to prove that the board manifested clear intent to bind

Both sides agree that the resolutions passed by the board and the related legislative record do not contain language indicating an intent to create a vested right to nonmodifiable retiree healthcare benefits. The parties disagree on whether the trial court erred in considering evidence beyond the resolutions passed by the board.

The county contends that *Retired Employees* and its progeny require courts to limit review to the text of the legislation alleged to confer the right and the record on which that legislation was adopted. The county argues that the rationale for limiting evidence of intent to the legislative record is to ensure that the court considers only the intent of the whole governing body, not the recollections or belief of individual legislators, because only a majority of the county board may legislate employee compensation. The county asserts that notwithstanding the trial court's in limine ruling to bar testimony "as it applies to the subjective intent of the decision makers," the trial court ultimately allowed plaintiffs to circumvent the ruling by permitting former supervisors to testify as to their knowledge or understanding of the county's provision of retiree healthcare benefits.

Plaintiffs maintain, however, that the general prohibition against inquiring into the subjective intent of individual legislators does not support a categorical bar against looking beyond the legislative record to ascertain the intended legal effect of a legislative enactment. They argue the trial court properly admitted evidence of information that was known to the board at the time it enacted the relevant resolutions.

It is axiomatic that a county acts only through its board of supervisors, which as its governing body "exercises the powers of the county." (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 344, fn. 9; see *County of Riverside v. Superior Court*

the county, since an implied promise, like an express promise, requires a " 'meeting of minds' " (*Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 215) or "ascertained agreement of the parties" (*Unilab Corp. v. Angeles-IPA* (2016) 244 Cal.App.4th 622, 636). Because our task at this juncture is to review the judgment rendered, we do not focus on any alternate formulations of the promise offered at trial but on the implied contractual term found by the trial court.

31

(2003) 30 Cal.4th 278, 285.)  Further, the difficult judgments required by the legislative function " ' "cannot be left to individual officers acting in isolation; rather, it is, and indeed must be, the responsibility of the legislative body to weigh those needs and set priorities for the utilization of the limited revenues available." ' " (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 302.)

For this reason, testimony regarding the understanding or intent of individual lawmakers or staff is generally irrelevant (and therefore inadmissible) to prove legislative intent.  As expressed by the California Supreme Court, "we have repeatedly declined to discern legislative intent from comments by a bill's author because they reflect only the views of a single legislator instead of those of the Legislature as a whole." (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 845; see *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062; *People v. Farell* (2002) 28 Cal.4th 381, 394 ["the expressions of individual legislators generally are an improper basis upon which to discern the intent of the entire Legislature"].)  Instead, to determine intent, "the court relies on the expression of the intent of the entire legislative body rather than statements made by individual members of the Legislature." (*City of Berkeley v. Cukierman* (1993) 14 Cal.App.4th 1331, 1341.)  "The subjective understandings of individuals, as well as understandings communicated outside the approval process, are not admissible as evidence of the City's intent." (*Vallejo Police*, *supra*, 15 Cal.App.5th at p. 617.)

Thus, as one appellate decision noted in a case involving a city's living wage ordinance, the testimony of a former city councilmember who served when the council passed the ordinance was "not admissible to show the intended meaning of the statute," though the court could properly consider contemporaneous memoranda from the city attorney to the city council concerning the draft ordinance. (*Aguiar v. Superior Court* (2009) 170 Cal.App.4th 313, 326, fn. 7.)  So, too, reviewing courts have typically declined to credit non-contemporaneous or after-the-fact statements regarding legislative intent. (See *Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*

32

(2010) 559 U.S. 280, 298 [deeming letter written by the bill's sponsors 13 years after its enactment "of scant or no value" for purposes of deciding statutory intent]; *Maples v. Kern County Assessment Appeals Bd.* (2002) 103 Cal.App.4th 172, 195, fn. 9 [rejecting as unpersuasive after-the-fact statements by the individual responsible for drafting the agency rule at issue, where that testimony was contrary to the "administrative record contemporaneous to the adoption and amendment" of the rule].)

Likewise, courts have rejected evidence of longstanding policies and practices—standing alone—as an adequate basis to establish clear legislative intent to create an implied vested benefit. "A practice or policy extended over a period of time does not translate into an implied contract right without clear legislative intent to create that right . . . ." (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (9th Cir. 2014) 742 F.3d 1137, 1142 (*Retired Employees II*), citing *Retired Employees*, *supra*, 52 Cal.4th at p. 1187.) Indeed, a consistent course of conduct does not imply contractual entitlement absent evidence of the requisite intent. (See *Sappington v. Orange Unified School Dist.* (2004) 119 Cal.App.4th 949, 954–955, [school district's 20-year course of conduct in which it provided retirees free health coverage under various plans did not support retirees' assertion that the longstanding benefit created an implied contractual mandate]; *Sacramento County Retired Employees Assn. v. County of Sacramento* (E.D. Cal. 2013) 975 F.Supp.2d 1150, 1166 [explaining that the course of conduct must give rise to the specific contractual understanding sought to be enforced as an implied contract].)

As these cases demonstrate, the relevance of extrinsic evidence to prove legislative intent to confer an implied contractual right is closely related to the function of the legislative process and is defined according to the commonly recognized indicia of legislative intent. (See, e.g., *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 (*Kaufman & Broad*) ["As a general rule in order to be cognizable, legislative history must shed light on the collegial view of the

33

Legislature as a whole.").)[13]  In comparing these standards to the scope of testimony admitted at trial, it appears that the trial court failed to adhere to its own articulated limit. That is, while on the one hand the court recognized that it could not consider "the subjective intent of the decision makers" and instead indicated it would allow testimony related to the circumstances surrounding passage of the resolutions and what the board members "were informed of" (presumably at the time they voted on the relevant resolutions), the court admitted and considered testimony beyond these parameters.

Former supervisors Michael Graves, Richard Place, Patricia Loe, Reb Monaco, and Donald Marcus each testified on behalf of plaintiffs regarding their knowledge or understanding of the county's retirement health insurance promise for county employees. But at no point were these former supervisors able to identify a communication from staff that conveyed their understanding to the board as a whole, or even a specific resolution or board meeting at which the county's commitment to lifetime retirement benefits at a specified level was discussed in open session.  Far from demonstrating a clear intent to promise lifetime retiree health insurance benefits based upon "the statutory language or circumstances accompanying [the] passage" (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187) of Resolution 93-96, or any of the subsequent resolutions, the testimony of the former supervisors reflected their generic knowledge or understanding of the benefits that

---

[13] The *Kaufman & Broad* decision provides a lengthy illustrative list of materials that generally constitute "cognizable legislative history." (*Kaufman & Broad*, *supra*, 133 Cal.App.4th at pp. 31–38.)  Though directed at requests for judicial notice of documents pertaining to legislative history, the list is instructive.  Examples of "cognizable legislative history" include conference committee reports, assembly staff analyses, and statements by sponsors, proponents and opponents *communicated to the legislature as a whole* (*id.* at pp. 31–36), whereas documents *not* constituting legislative history include legislator statements, letters, and press releases not communicated to the legislature as a whole, and views of individual legislators, staffers, and other interested persons.  (*Id.* at pp. 37–38.)

34

the county offered, and by which it sought to attract and retain employees.[14]  In other words, plaintiffs adduced from the former supervisors the very information that case authority deems irrelevant to the determining legislative intent—each of their "subjective understandings . . . , as well as understandings communicated outside the approval process."  (*Vallejo Police*, *supra*, 15 Cal.App.5th at p. 617.)

Furthermore, the former board members who testified on plaintiffs' behalf each referenced a formulation of the purported promise that the trial court ultimately rejected (i.e., that of a lifetime commitment or guarantee to pay retiree healthcare benefits in full or at 100 percent); none recalled or described a promise in the terms ultimately selected by the trial court—one based on equal contributions for retirees and active employees. The sole witnesses who articulated that expression of the county's implied promise were plaintiffs themselves, who testified both regarding 100 percent coverage of the medical premium for life (rejected by the trial court) *and* regarding lifetime coverage at the same rate paid for active employees as well as former county administrative officer David Edge and former human resources technician and management analyst III Jacqueline

---

[14] For example, as summarized in more detail *ante* (part I.B.2.b.), Michael Graves, who served on the board from 1982 to 1995, testified that his "knowledge" of the "retirement health insurance promise" for county employees was that it was "an inherent lifetime benefit to retain employees in San Benito County."  Richard Place, who served on the board from 1997 to 2000, testified that he understood from the then-county administrative officer that retirement benefits vested after five years of service, at which point the county was committed to paying 100 percent of employees' coverage for a selected premium.  Patricia Loe, who served on the board from 2003 to 2010, testified that her knowledge of the county's "guaranteed" lifetime health insurance benefit for individual coverage at the "middle tier" CalPERS plan came from former county administrative officers and human resources staff.  Reb Monaco, who served on the board from 2003 until 2010, believed, based on information from Jaqueline Credico in human resources, informal conversations with other supervisors, and his own receipt of benefits from the county, that a resolution adopted before his tenure committed the county to provide fully paid retiree healthcare benefits for life.

Credico.[15]  But as set forth *ante*, the testimony of former government staff or employees cannot substitute for admissible documentation or testimony of legislative intent based on the understanding expressed by the board as a whole in connection with the legislative approval process.  (See, e.g., *Kaufman & Broad*, *supra*, 133 Cal.App.4th at p. 38 [listing "views of individual legislators, staffers, and other interested persons" as outside the scope of judicially noticeable evidence to prove legislative intent] (boldface & capitalization omitted).)

Plaintiffs maintain, however, that the trial court's inclusion of testimony pertaining to the facts and circumstances known to individual supervisors at the time they enacted resolutions "was proper because it was needed to clarify a legislative record that was paltry on intent."  Plaintiffs rely on language in a decision by a panel of this court which sought to clarify the limits on discovery and admissibility of legislative intent evidence.  (See *City of King City v. Community Bank of Central California* (2005) 131 Cal.App.4th 913, 942–948 (*King City*).)

The decision in *King City* addressed a city council's deposit of funds as collateral for a redevelopment loan and reviewed, in relevant part, the trial court's exclusion of what the reviewing court ultimately held to be "proper objective indicia of legislative intent, including the circumstances of the enactments in question and what actually took place at public meetings where those enactments, or matters related to them, were publicly discussed and adopted."  (*King City*, *supra*, 131 Cal.App.4th at p. 919.)  The

---

**[15]** Edge, who served as the county administrative officer from 1989 to 1998, understood that the county's benefits entitled retirees to the same healthcare benefit that active employees received and that the county could modify its policy prospectively but not retroactively.  Edge did not recall any resolution or record that would reflect his understanding that retirees' medical contributions were equivalent to active employees. Jacqueline Credico worked for the county in several roles, including human resources, from 2002 to 2018.  In her meetings with prospective retirees, Credico would explain that once the county's contributions for retirees equaled contributions for active employees (as occurred in 2012), that benefit would continue for life.  She communicated the same information to the supervisors.

36

court explained that while "[c]ourts will not permit testimony from current or former public officials concerning their intentions or understandings of legislative actions" (*id.* at p. 942), those limits "do *not* support a categorical rule against looking beyond the minutes of local agency action to ascertain the meaning and intent of a patently ambiguous enactment." (*Id.* at p. 944.) Plaintiffs thus contend that where meeting minutes and language contained in resolutions are silent on key points relating to their legal effect, *King City* confirms that a party may adduce evidence bearing on the ambiguous legislative intent, "including statements made or information otherwise conveyed to the Council about the reason and need for the measures, the circumstances giving rise to them, and their probable or desired effects." (*Id.* at p. 948.)

We agree that *King City* provides a useful elucidation of the boundaries of admissible evidence and testimony concerning the meaning of municipal legislation where the measure itself is unclear. But plaintiffs overlook critical points in *King City*'s analysis which undercut the trial court's broad admission of generic "knowledge" and "understanding" evidence in this case. The court in *King City* recognized that admissible extrinsic evidence must be circumscribed by its relationship to the public record and collective knowledge or intent of the governing body. As stated in *King City*, where the issue before the court is "the *collective intent of the legislature,* as objectively manifested in the adoption of particular measures, courts may and must consult extrinsic evidence including circumstances and information known to the Legislature at the time of the enactment, public records of their collective deliberations, and expressions of intent collectively adopted by them." (*King City*, *supra*, 131 Cal.App.4th at p. 944.) The court further explained "that California law may prevent individual legislators from saying what they privately believed a measure would do, even if a majority of them are prepared to so testify. But nothing in California law prevents discovery and evidence of what legislators *said* about a proposal before them *in the presence of the body,* even if their

37

statements can be conceived as reflecting a mental state or process, provided the evidence is offered to show *what the body was voting on when it adopted the measure*." (*Ibid.*)

Examples given by the court in *King City* demonstrate that the types of evidence to which it referred included authenticated reports of committees and officers, where the record shows the report was adopted by members or acted upon by them, and authenticated recordings of the relevant proceedings. (*King City*, *supra*, 131 Cal.App.4th at p. 947.) Upon careful review, these examples bear little resemblance to the testimony that predominated at trial here. Plaintiffs' evidence mainly consisted of former supervisors' recollections of their personal knowledge or understanding of the county's retirement benefits offering, none of which articulated the implied promise ultimately selected by the trial court and all of which were unmoored from any proceeding, resolution, or staff report to which such intent or knowledge could be imputed. Critically, none of this testimony involved supervisors' statements or staff presentations made in the presence of the board to show "*what the body was voting on when it adopted the measure*." (*Id.* at p. 944.)

In the absence of these factors, we conclude that plaintiffs' evidence from former supervisors did not relate to the legislative body's collective sense "as inferred from the public record of, and the circumstances surrounding, the adoption of the measure." (*King City*, *supra*, 131 Cal.App.4th at pp. 947–948.) This evidence therefore fell outside the bounds of admissible evidence set forth in *King City*. This conclusion accords with the California Supreme Court's application of *Retired Employees*'s principles in *Cal Fire*, where the court reiterated its holding that "the resolutions of a board of supervisors governing the terms and conditions of county employment could create implied contractual rights 'when the language or circumstances accompanying [enactment of the resolutions] clearly evince a legislative intent to create private rights of a contractual nature.' " (*Cal Fire*, *supra*, 6 Cal.5th at p. 979.)

We therefore decide that the trial court erred in considering legally inadmissible evidence to construe the board's intent. (*Coffey*, *supra*, 60 Cal.4th at p. 1213; see Evid. Code, § 350 ["No evidence is admissible except relevant evidence."].) As this evidence was not relevant to whether the board as a whole intended to promise that retired employees should receive guaranteed health insurance payments, in perpetuity, at an equal contribution rate as active employees, we will not consider it in determining whether plaintiffs met their burden of establishing the board's intent. (*Coffey*, at p. 1213.)

Our conclusion that the testimony of the former board members in this case largely exceeded the standards of admissibility requires us to consider whether the remaining evidence nevertheless supports the trial court's finding of an implied contractual vested right to equal contribution toward retiree healthcare premiums. The admissible evidence includes the relevant resolutions and related legislative record, including staff reports, meeting minutes, and that testimony which did relate to or describe circumstances informing specific board decisions and the county's course of conduct in providing the benefits in question,[16] all of which were entered into evidence at trial.

The parties have already agreed—and plaintiffs in fact concede—that Resolution 93-96, subsequent resolutions, and the accompanying legislative record do not provide

---

[16] We refer, for example, to the testimony by Jacqueline Credico and supervisor Anthony Botelho concerning a discussion recorded in the minutes of the November 6, 2012 board meeting regarding the county's equal contribution obligation under PEMHCA. Botelho requested that Resolution No. 2012-67 be "pulled for discussion" and taken off the consent agenda. He asked about the cost of raising retirees to the same contribution rate as active employees, and Credico responded that the "commitment had been made in 1993 in regards to health benefits for retirees" and that the county would have the opportunity to renegotiate its contributions "when contracts opened up with the bargaining units."

Credico testified that she explained at that time that the county had " 'an obligation to retirees to provide considerable health benefits.' "

the requisite support for a finding of an implied vested right in specified retiree healthcare benefits. Our independent examination of the resolutions and accompanying legislative record confirms that the parties are correct in their acknowledgment of this point. The statutory language contains no indication, express or implied, that the commitment articulated in Resolution 93-96 to increase the county's contribution for retirees' benefits "until such time as the amounts are equal" to active employees' benefits created a vested right to such equal contributions extending even beyond the county's election to be subject to PEMHCA. Subsequent resolutions fixed the county's commitment to pay employee and retirement healthcare premiums for that period. Resolution No. 2012-67, which reflected that the county's contribution for employees and retirees had reached parity consistent with the "equal contribution" rule under PEMHCA, expressly stated that the "employer's contribution for each employee" and "for each annuitant" set forth in the resolution were "for the calendar year 2013." It therefore cannot support an implied promise to make such payments in perpetuity.

In addition to the evidence of subjective intent we have already determined was legally irrelevant, the trial court cited the board's apparent acquiescence to or adoption of the information about retirement benefits being disseminated by David Edge and Jacqueline Credico. The trial court reasoned that the board "relied on this information" and "signaled its agreement by taking no steps over a 21 year period to otherwise instruct its managers or attempt a modification relating to the promised benefits."

We recognize that this evidence may be construed as presenting a pattern, practice, or course of conduct in which the board regularly reconfirmed (through the passage of resolutions) the county's intent to provide healthcare benefits to retirees in a manner consistent with the equal contribution provision of PEMHCA. However, as stated *ante*, a continued practice or course of conduct is not in and of itself evidence of legislative intent sufficient to create an implied vested benefit. (*Vallejo Police*, *supra*, 15 Cal.App.5th at p. 619 [rejecting argument that "the City's 'uninterrupted history' of

paying the full cost of retiree medical premiums constitute[d] extrinsic evidence of the existence of a vested right to that level of benefit"]), citing *Retired Employees II*, *supra*, 742 F.3d at p. 1142; see also *Sappington*, *supra*, 119 Cal.App.4th at p. 954 [noting the fact that retirees " 'accepted' " the benefit of alternative health plans provided by the school district for 20 years]; *id.* at p. 955 ["does not mean they understood they were *contractually entitled* to such alternatives"].) This is especially true where the board's renewal of its commitment to paying retirees' healthcare benefits at an "equal contribution" rate as active employees was mandated by the statutory scheme under which the county had elected to provide healthcare benefits for its employees and retirees. (See § 22892, subd. (b)(1).)

What is more, drawing an inference of legislative intent to confer an implied contractual, vested right to a specified level of benefit from the board's conduct here would appear to invert the standard articulated in *Retired Employees*. The California Supreme Court directed that "[a] court charged with deciding whether private contractual rights should be implied from legislation . . . should 'proceed cautiously both in identifying a contract within the language of a . . . statute and in defining the contours of any contractual obligation.' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1188.) To that end, *Retired Employees* requires us to presume " 'that a statutory scheme is not intended to create private contractual or vested rights' " (*id.* at p. 1186) and to impose " 'the burden of overcoming that presumption' " on the party asserting the creation of an implied contractual right. (*Ibid.*) Instead, here, the trial court determined that because the board had "full knowledge as to what the retiree benefits were known to be" and "took no action to modify [those benefits] prior to 2014," it was the board's intent to contractually guarantee those benefits. The court reasoned that "[h]ad the county's intent been otherwise, it would be expected that definitive action would have been taken early on to correct the situation."

41

We conclude that the trial court's use of inference under these circumstances was error because it effectively reversed the presumption established by *Retired Employees*. The derivation of "vested retirement rights guaranteed to [p]laintiffs" from the board's imputed failure to modify the county's benefits sooner contravenes the rule that such rights may be implied only "when the statutory language or circumstances accompanying its passage 'clearly " . . . evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187.) Notably, because providing retiree healthcare benefits at an "equal contribution" rate as active employees was statutorily required for the county's participation in the CalPERS health benefits program (§ 22892, subd. (b)(1)), "modifying" the county's provision of retiree healthcare benefits to remove or alter the promise to provide an equal contribution was not as simple as amending the language of one of the annual resolutions but would have required the county to exit entirely out of PEMHCA, as it ultimately did in 2016. Under these circumstances, we decide plaintiffs have not satisfied their burden at trial to prove the board acted with the "requisite clear manifestation of intent" to create an implied, vested, contractual right to nonmodifiable retiree health benefits. (*Cal Fire*, *supra*, 6 Cal.5th at p. 981; *Retired Employees*, at p. 1187.)

### 4. Summary

In *Retired Employees*, the California Supreme Court considered the question posed to it by the United States Court of Appeals for the Ninth Circuit and concluded that "under California law, a vested right to health benefits for retired county employees can be implied under certain circumstances from a county ordinance or resolution." (*Retired Employees*, *supra*, 52 Cal.4th at p. 1194.) The high court recognized that the circumstances in which an implied vested right to retiree health benefits might properly be construed were "limited" (*id.* at p. 1183) and held that "implied rights to vested benefits should not be inferred without a clear basis in the contract or convincing

42

extrinsic evidence." (*Id.* at p. 1191.) The court directed courts presented with an implied contractual rights claim to exercise "sensitivity" to the policy-making function of the governmental body (*id.* at p. 1185) by employing a presumption *against* the creation of private contractual or vested rights. (*Id.* at p. 1186.)

Although the court in *Retired Employees* did not expressly delineate the scope of "extrinsic evidence" (*Retired Employees*, *supra*, 52 Cal.4th at p. 1191) admissible to prove an implied vested right, the decision's examination of implied contractual rights and of the principle, policy making function of a county board suggests that to be relevant, such evidence must pertain to "the statutory language or circumstances accompanying its passage." (*Id.* at p. 1187.) This understanding is moreover consistent with well-established case authority more generally on the scope of admissible evidence to ascertain legislative intent. (See, e.g., *King City*, *supra*, 131 Cal.App.4th at p. 944; *Vallejo Police*, *supra*, 15 Cal.App.5th at pp. 619–620.) In addition, the California Supreme Court in its subsequent decision in *Cal Fire* emphasized the importance of written evidence of legislative intent (in the form of MOUs) to the *Retired Employees* analysis. (*Cal Fire*, *supra*, 6 Cal.5th at p. 980.)

While the trial court in this case recognized the standards set forth in *Retired Employees*, it failed to follow the high court's guidance that legislative acts are not presumed to create private contractual or vested rights in the absence of a clear and unequivocal manifestation of intent by the legislative body itself. (*Retired Employees*, *supra*, 52 Cal.4th at p. 1186.)

After finding that the board had "full knowledge as to what the retiree benefits were known to be" based on the testimony of former county managers and administrative personnel, the trial court inferred from the board's failure to alter its continued provision of healthcare benefits under the "equal contribution" rule imposed by PEMHCA that it intended to create an implied, vested right to benefits at the equal contribution rate. This determination effectively imputed to the board a legislative intent to create a vested right

43

to "equal contribution" retiree healthcare benefits despite (1) PEMHCA's statutory requirement that the county make an "equal contribution" toward retirees' and employees' healthcare premiums, which would have required the county to exit CalPERS to "modify" that feature of the benefit, and (2) the absence of any otherwise admissible evidence based on "the statutory language or circumstances accompanying its passage" such as would " 'clearly " . . . evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' " (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187.)

We therefore conclude, based on our independent review of the record in this case and the application of binding precedent set forth in *Retired Employees* and *Cal Fire*, that plaintiffs here have not met their burden to demonstrate a clear manifestation of intent by the board to create an implied, vested, contractual right to retiree healthcare benefits for county retirees at an "equal contribution" rate as that paid for active employees. Consequently, the judgment must be reversed.[17]

In reaching this conclusion, we recognize the significance of the judgment, and the painful impact of its reversal, on those county retirees who have experienced increased health insurance premiums in retirement and reduced benefit contributions paid by the county. There is no dispute that Rose and Riopel understood, through the course of their employment and derived from communications with human resources or other county administrative staff, that the county would cover their medical premiums in retirement as during employment. While we are sympathetic to the unfairness of the result here, our Supreme Court has articulated a rigorous presumption against inferring implied, vested contractual rights, except where manifest in the language of the relevant government resolutions and related, admissible extrinsic evidence. The absence of any clear manifestation of intent by the board to create an implied, vested, contractual right to

---

[17] In light of this conclusion, we need not reach the subsidiary issues raised by the county of equitable estoppel and the defenses of statute of limitations and laches.

retiree healthcare benefits for county retirees at an "equal contribution" rate as that paid for active employees is decisive under the governing standard.

*C. Remedy*

Having concluded that plaintiffs failed to overcome the presumption against the creation of an implied vested right to retiree health benefits for life at an equal contribution rate as active employees, and therefore that the trial court's judgment must be reversed, we address the appropriate remedy.

The county and amici suggest that plaintiffs' failure to rebut the presumption assigned by *Retired Employees* and satisfy their burden to establish an implied contractual obligation or vested right as claimed warrants a reversal of the judgment and remand to the trial court with instructions to enter judgment for the county on all claims. In support of this outcome, the county contends that the evidence in the legislative record on which the relevant resolutions were adopted disproves any intent of the board to be bound for longer than the duration of each resolution enacted while the county was subject to PEMHCA. Alternatively, in its reply brief the county states that this court could "reverse and remand for a trial limited to the legislative record." Plaintiffs do not comment on the county's proposed remedy.

A remand for further proceedings, such as a trial limited to the admissible evidence as described more fully in this opinion, would be appropriate if we were to discern any remaining disputed factual issues for resolution by the fact finder, or any further issues to be litigated. (See *Manderson-Saleh v. Regents of University of California* (2021) 60 Cal.App.5th 674, 706; accord *Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 440 [reversing with directions where "there will be no factual issues to be determined after a reversal of the judgment, since the errors of the trial court were of law only"].)

By contrast, where our independent review of the record reveals only one proper judgment on undisputed facts, we may direct the trial court to enter that judgment. (Code

45

Civ. Proc., § 43; see *Conley v. Matthes* (1997) 56 Cal.App.4th 1453, 1459, fn. 7; *Burtis v. Universal Pictures Co.* (1953) 40 Cal.2d 823, 835 [reversing judgment with directions to superior court to enter "proper judgment" in copyright infringement case where "the implied finding of copying . . . has no support in the record"].)  Indeed, "[a]n appellate court may reverse a judgment with directions to enter a different judgment if it appears from the record that no new evidence of significance would be presented in a new trial and there is only one proper judgment." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357 (*Singh*); cf. *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 76 [declining to direct entry of a defense judgment despite the "paucity of relevant evidence in the record and the likelihood [the plaintiff] will not prevail" since "it is possible there are facts which would support a judgment" in the plaintiff's favor and so it "would not be appropriate to end the lawsuit at this time"].)

In *Singh*, the appellate court observed that where the issue at trial had been fully litigated, and there was no substantial evidence to support the verdict and "no indication that any different evidence would be presented in a new trial," the defendants were entitled to judgment in their favor as to that cause of action.  (*Singh, supra*, 186 Cal.App.4th at p. 357.)  The appellate court reached a similar conclusion in *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205 (*Mid-Century*).  In considering resolution of the appeal, the court decided that where "[t]he plaintiff was not suffering under any improper court-imposed limitations on its ability to introduce evidence, nor was its litigation theory erroneously based," the court could "consequently assume it marshalled the best case it could at trial." (*Id.* at p. 1220.)  The appellate court decided under those circumstances that it was proper "to direct that judgment be entered in favor of the defendants to avoid any additional expense." (*Ibid.*)

So, too, here, after a trial in which the issues were fully litigated and no relevant evidence excluded, neither the record nor the parties provide any indication that different evidence would be presented in a new trial.  Plaintiffs were "not suffering under any

46

improper court-imposed limitations on [their] ability to introduce evidence" and apparently "marshalled the best case [they] could at trial." (*Mid-Century*, *supra*, 9 Cal.App.4th at p. 1220.)  Plaintiffs expressly recognize that the legislative record in this case does not provide substantive guidance as to the board's intent to create a vested right to paid retiree healthcare benefits.  Because any implied vested right must be derived from "the statutory language or circumstances accompanying its passage" (*Retired Employees*, *supra*, 52 Cal.4th at p. 1187), a remand under these circumstances would require the trial court to render its decision based primarily upon a record that plaintiffs have conceded does not prove their claim.  Even if we account for the limited body of evidence extrinsic to the legislative record but which, as described *ante* in this opinion, meets the standards of admissibility (such as testimony firmly grounded in the legislative record or that reflects information conveyed to the board as a whole during the deliberative process), we are constrained to conclude that the evidence is inadequate as a matter of law to carry plaintiffs' " 'heavy burden' to demonstrate [the requisite] intent." (*Id.* at p. 1190.)  For these reasons, we will reverse the judgment with directions to the trial court to enter judgment for the county on all claims.

It necessarily follows that upon reversal of the judgment in their favor, plaintiffs are no longer entitled to any award of attorney fees.  (*Shirvanyan v. Los Angeles Community College District* (2020) 59 Cal.App.5th 82, 107.)  The county's decision not to separately appeal the postjudgment attorney fees award does not alter this outcome. The trial court awarded attorney fees pursuant to Code of Civil Procedure section 1021.5. That section authorizes attorney fee awards "to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest." (*Merced County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402.)  The costs to which a prevailing party are entitled include attorney fees authorized by statute.  (*Ibid.*; see Code Civ. Proc., §§ 1032, 1033.5, subd. (a)(10)(B).)  Because "[a]n order awarding costs falls with a reversal of the judgment on

47

which it is based" (*Cardella*, at p. 402), the order granting attorney fees here must be reversed.

### III.  DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court with directions to enter a new judgment in favor of the county.  The new judgment shall (1) declare that plaintiffs (referred to as petitioners in the amended judgment filed on December 3, 2020) do not have a vested right to receive the same health insurance premium contributions as the county provides its active, unrepresented employees, (2) deny the requested preemptory writ of mandate, and (3) order that plaintiffs recover nothing on their claims.

The order awarding plaintiffs' attorney fees is reversed.

In the interests of justice, the parties shall bear their own costs on appeal.

_____
                    Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Lie, J.

**H048681**
*Rose, et al. v. County of San Benito*

| | |
|---|---|
| Trial Court: | San Benito County Superior Court<br>Superior Court No. CU1700151 |
| Trial Judge: | Hon. Robert A. O'Farrell |
| Counsel for Defendant/Appellant:<br>County of San Benito | Colantuono, Highsmith & Whatley, PC<br>Michael Colantuono<br>John L. Jones II<br><br>Renne Public Law Group<br>Arthur A. Hartinger<br>Steve J. Cikes |
| Counsel for Amicus Curiae:<br>League of California Cities and<br>California State Association of<br>Counties | Burke, Williams & Sorenson, LLP<br>Daphne M. Anneet |
| Counsel for Plaintiffs/Respondents:<br>Normandy Rose and Margaret Riopel | Wylie, McBride, Platten & Renner<br>Christopher E. Platten<br>Kevin S. Landis |

**H048681**
*Rose, et al. v. County of San Benito*